50 So.2d 100 (1951)
COBB
v.
JEANSONNE, Sheriff, et al.
No. 7543.
Court of Appeal of Louisiana, Second Circuit.
January 5, 1951.
*101 Kemble K. Kennedy, Baton Rouge, C. A. Riddle, Sr., Marksville, for appellant.
Philo Coco, Marksville, for appellees.
TALIAFERRO, Judge.
Tyrus Ellis Cobb, the husband of Adelia Bordelon Cobb, was arrested by Gaston Marcotte, Deputy Sheriff, for disturbing the peace at a night club, called Club Playtime, near the Town of Bunkie, Louisiana, in Avoyelles Parish, about 9:30 o'clock P. M., May 16, 1942. He was immediately put in the Bunkie jail, where he died at about 7:00 o'clock the following morning from blood clot on the brain, of traumatic origin.
The widow of the deceased, individually, and as natural tutrix of her two minor children, Tyrus Ellis Cobb, Jr. and William Donald Cobb, issue of her marriage to decedent, instituted this suit on May 11, 1943, against J. W. Jeansonne, Sheriff of Avoyelles Parish, said deputy, and Maryland Casualty Company, surety on the official bond of said sheriff, to recover a large amount of damages, on the theory that the maltreatment of Cobb by the arresting deputy at time of and after the arrest, and "incarcerating him in jail without medical attention and thereby causing his untimely death, as alleged herein constituted gross misconduct and was an unwarranted, wrongful, unfaithful and improper performance or discharge of an official act."
The petition is quite lengthy. It is alleged therein that prior to May 16, 1942, said Sheriff had assigned Marcotte to duty as Deputy Sheriff at said Club Playtime, and he was on duty there in his official capacity the night of May 16, 1942; that on said night the said Tyrus Ellis Cobb, in company with R. G. McSwain, Miss Virginia Garnet and her nephew, a James Gentry, visited said club; that said Cobb and McSwain became involved in a quarrel with other invitees in the dance hall of the club, whose names are unknown to petitioner and a disturbance followed; that the said Deputy Sheriff shoved Cobb and McSwain out of the dance hall into the adjoining saloon room, and there engaged in a fight with them; that he first subdued McSwain after clubbing him with a blackjack, into unconsciousness; that said Deputy then turned and advanced on Cobb, who was leaving the place, accompanied by Miss Garnet, grabbed him by the arm, jerked him around, and motioned as if to hit him with the blackjack; that notwithstanding Cobb was unarmed and had his free arm upraised, and pleaded, along with Miss Garnet, not to strike him, the said Deputy began to strike Cobb violently with the blackjack about the head and over the ears and temples; that this beating continued until the parties were outside the front of the building, when Cobb tried to defend himself by using his feet and legs, "but Marcotte continued relentlessly to strike him with said weapon" until finally a terrific blow to the head brought Cobb to the ground "trembling, helpless and unconscious."
It is also alleged that said Deputy Sheriff caught Cobb by the left arm and dragged him thirty feet, on gravel, and "pitched his limp body" into Marcotte's car; that he also "dumped" McSwain, who it is alleged had also been badly beaten, into the same car and drove them to the jail in Bunkie, where they were imprisoned.
Plaintiff also alleged that a post mortem operation upon the body of Cobb by Dr. H. H. Hardy, Jr., of Alexandria, Louisiana, disclosed that death resulted from *102 the injuries sustained by him at the hands of said Deputy Sheriff; that in leaving the deceased in jail, after having beaten and bruised him, without medical attention and treatment, "constituted an unfaithful, inhuman and improper performance of an official act."
The defendants severally filed exceptions of no cause and no right of action, which were referred to the merits. In rendering judgment the Lower Court overruled them. Defendants also severed in their answers. In substance, the answers are virtually the same. The surety company, of course, pleaded that in the event defendants should be held liable for damages for an amount in excess of Six Thousand ($6,000.00) Dollars, its liability be limited to that extent, this being the amount of the bond issued by it to the Sheriff.
Answering, all defendants deny that Cobb's death was due to any extent to any act of violence inflicted upon him by Marcotte, specifically denying that he struck him at all, and averring that he only used such force to subdue McSwain as was necessary under the circumstances. They specifically allege that it was the official duty of Marcotte to preserve peace in and about the club house and in furtherance of that duty, he arrested Cobb, who was guilty of disturbing the peace within the club building, illegally causing damage to property, striking guests of the club, resisting an officer of the law (Marcotte) and "otherwise making of himself a troublesome and menacing guest."
Defendants further plead that when Cobb and his companions arrived at the club, they were in an intoxicated condition; that while in the dance hall thereof they became involved in a quarrel, "culminating in a free for all fight, where fists, bottles and chairs were freely used in combat"; that when the fight began Marcotte was temporarily on the outside of the building, but was immediately summoned to restore order and break up the fight, and attempted to do so quietly and peacefully; that in the melee Cobb had thrown Gentry across a chair and was pommeling him into unconsciousness, and while Marcotte was in the act of trying to separate the parties, Cobb turned upon him and struck him violently with his fist; that Cobb then began to curse and revile Marcotte and threatened to get him, etc.; that Cobb was then put under arrest and as he was being conducted from the dance hall into the barroom, Marcotte was attacked most violently and unexpectedly by McSwain, who began beating and kicking him in the groin; that being so suddenly and unawares attacked, Marcotte called for assistance, but none of value came; but he finally was able to get hold of his blackjack and by the use of it succeeded in subduing McSwain who was also arrested and placed in the Bunkie jail with Cobb.
Defendants also plead that when placed in jail Cobb talked fluently, although showing evidence of intoxication; that he did not complain of physical injury and was not bleeding nor in any other manner showed any ill effects of his experiences; that at the time of incarceration he requested some one then in or about the jail to buy him some Lucky Strike cigarettes; and that the wounds that he received were inflicted by some one (other than Marcotte) during the fights he engaged in prior to his arrest.
The trial judge rejected plaintiff's demand, and gave lengthy written reasons for his action. This appeal is prosecuted by the plaintiff.
It will be observed that this case pended some seven years before its trial. However, a goodly number of the witnesses who had knowledge of the facts pertinent to the alleged cause of action were living and gave testimony in the case.
Defendants, with regard to the exceptions, simply submit them with the statement that they should be sustained. They appear to have been directed against the alleged insufficiency of the averments of the petition with respect to the responsibility of the Sheriff and his surety for the alleged acts of malfeasance of Marcotte. The exceptions are without merit. Surely, before and after a Deputy Sheriff has arrested and handcuffed an accused, if he unnecessarily beats him with a dangerous weapon, and thereby causes his *103 death, he is guilty of unfaithfully, illegally and wrongfully performing the duties of his office. These are the charges against Marcotte, and for the purpose of passing on the sufficiency of the petition, they are assumed to be true.
The Club Playtime provided attraction for all persons who desired to gamble, dance, eat and/or drink. It was within hail of two army camps and men in uniform comprised a large element of its patronage, especially on Saturday nights. To conserve the peace and protect patrons against rowdyism, drunkenness, etc., of the rough element, it was necessary that a peace officer of physical prowess be constantly on hand. To meet this need the Sheriff had deputized and assigned to duty there, Gaston Marcotte, six feet two inches tall, weighing two hundred twenty-five (225) pounds, aged forty-eight (48) years, whose salary was paid by the club operators.
Prior to the hour of 9:00 o'clock P. M. on Saturday, May 16, 1942, the decedent, R. G. McSwain, and James Gentry arrived at the club, directly from the City of Alexandria, Louisiana, some thirty (30) miles distant. They had imbibed some before arriving, and consumed some hard liquor after their arrival, although the record does not establish that either became wholly intoxicated prior to the time the row, culminating in the arrest of Cobb and McSwain by Marcotte, took place.
The primary questions tendered by the record are factual, viz.: Did Marcotte employ unnecessary physical force to effect the arrest of Cobb, and brutally beat him after the arrest? The testimony pro and con is hopelessly contradictory, so much so that it is inconceivable that sane people could honestly vary so greatly in their accounts of the happenings. There is outstanding, and beyond any question, one fact, to-wit: Cobb died of cerebral hemorrhage following a violent blow to the right side of the head that fractured the skull and temple.
Plaintiff's case is supported by the testimony of McSwain, Gentry, Mrs. Virginia Bryant, nee Virginia Garnet, and one Frank Milligan, whose enmity toward Marcotte was obvious.
It appears that the club house is divided into at least three partsthe gambling room, dance hall and the barroom. Gentry testified that his attention was attracted by a "ruckus" in the gambling room; that he went into this room and, to use his own language, "saw the fight going on between this fellow sitting here (pointing to Marcotte) and Ty" (meaning the deceased). He testified further that after it (the fracas) got started, McSwain ran "in there (the gambling room) and tried to stop the two from fighting and he (Marcotte) hit McSwain with a blackjack or club * * * and then turned around and hit Cobb * * * over the left eye; that Ty fell to his knees and tried to cover up his head and he hit him on the shoulder"; that Marcotte and another fellow dragged Cobb by the feet out of the building and Marcotte started "hitting him again * * * on the head around the left temple near the ear." He added that while this was going on, McSwain was on the outside of the building, sitting on the back of a pick-up truck holding his head; that Cobb was not handcuffed; that he was dragged some twenty (20) feet and placed on the rear seat of an automobile with McSwain, and driven to the jail; that he also went to the jail, after the lapse of a brief time, and there talked to McSwain, but not to Cobb, as he was still "unconscious". This witness, after testifying to the facts outlined above, which placed the scene of the original fighting in the gambling room, stated that the "ruckus" was "in front of the gambling room", which would have been either in the barroom or dance hall. He is positive both Cobb and McSwain fell to the floor from blows by Marcotte and that Cobb begged not to be hit any more.
As an accommodation to Dr. H. H. Hardy, who performed the autopsy, the examination of Gentry was suspended, to allow the doctor to testify. He stated the fracture and blood clot that produced death were both on the right side of the head. At the conclusion of Dr. Hardy's testimony, Gentry again took the witness stand. Inter alia, he stated that the blow that felled Cobb to the floor was to the *104 right side of the head. When his former testimony that this blow was to the left side of the head was called to his attention, he vigorously denied so testifying. But, as the record plainly shows, he did testify a half dozen times that the blow was to the left side of the head. After hearing Dr. Hardy testify, he decided to change his testimony in the respect mentioned.
McSwain testified that the "ruckus" in the gambling room followed the detection by Cobb of the operator of the game "switching" dice, but that it was over and he and Cobb then walked out of the room into the dance hall, and he then observed Marcotte "by that bunch of soldiers there doing all of the fighting, so we went around to our table" in the dance hall. He testified further that "we" decided to go and "I was leading the party and when I got half way out of the door, Mr. Cobb called me back and said that Mr. Marcotte was going to arrest him"; that he walked back to learn what the trouble was and Marcotte did not give him a chance to ask him any questions, but hit him on the right side of the head with a blackjack; that the blow did not knock him down, but stunned him for a few minutes; and "when I came to my senses, I flew into him and fought with him for about fifteen minutes, it seemed like", during which time he was struck several times with the blackjack. He was using his naked fists on Marcotte. He said he was struck seven or eight times as well as he could remember and added: "when I came to, I was on the outside front". He was unable to recall how he got into the car, and again says: "When I came to, I was sitting in the car". Notwithstanding his mental condition was such that he did not know how he got outside the building, nor how he got into the car, he well remembers seeing Marcotte strike Cobb after all of them were out of the building. He also testified that Cobb was struck by Marcotte one or more times on the way to the jail, because of an argument. He did not see Marcotte strike Cobb inside the building.
Frank Milligan, whose prior conduct in and about the club had been so bad that Marcotte had given him orders to stay away, testified that he was present and saw much of the fighting. He says: "I happened to be in the bar and I saw the fight that was going on, and I seen Mr. Marcotte and two other fellows; one was trying to pull the other one off Mr. Marcotte, and Mr. Marcotte then hit him". He was asked: "Which one?" and he answered: "The one was trying to pull the other one off and then Mr. Marcotte and several others, which I do not know who they were, threw Mr. Cobb outside four or five feet from the door, and then run out around the car and hit Mr. Cobb three times with a blackjack."
This testimony is not in consonance with that of Guidry or Mrs. Bryant, but contrary thereto in substance and detail.
Concerning the probative worth of the witness' testimony, the trial judge said: "His testimony on cross examination plainly indicated that he had a personal dislike for deputy sheriff Marcotte because of having been refused admittance in said club on previous occasions. The Court knows Frank Milligan and has known him for a number of years and will refrain from elaborating extensively on his testimony. Suffice it to say, it has given it all the consideration it deserves."
Mrs. Virginia Bryant testified that she saw some soldiers fighting in the corner of the dance hall (she was then dancing) and was asked: "Was everybody fighting that was in the dance hall by that time?" To which, she answered: "Yes."
She was also asked if she observed an altercation or fight between Marcotte and McSwain and Cobb, to which she responded: "Well, the fight was started and we ran to the door where Mr. Marcotte was hitting Mr. Cobb on the head and I asked him not to hit him any more, and he pushed me aside and kept on hitting Ty, and told me to go on." She qualified her testimony by afterward saying she saw Marcotte hit Cobb only once. She says she saw no fight between Marcotte and McSwain and saw no fight on the *105 outside of the club house. Her testimony is, in the main, contrary to that of other witnesses for plaintiff.
We here mention that regardless of the testimony of plaintiff's witnesses that Cobb was violently struck by Marcotte while in the building, the petition does not so allege.
Marcotte testified that as a rule he reported for duty at the club house around 5:30 or 6:00 o'clock P. M. and followed this rule on the day this trouble arose; that around 9:00 or 9:30 o'clock, while eating supper in the kitchen, a racket was started in the dance hall, on the right hand corner as you come in; that McSwain, Cobb and some lady with them (evidently referring to Miss Garnet) and two or three soldiers "went to fighting, which they turned chairs and tables upside down, bottles"; that as he tried to separate them, Cobb hit him on the chin; that he shoved Cobb out of the dance hall into the barroom, and told him he was under arrest, and while putting handcuffs on one arm, McSwain clinched him about the waist from behind, which forced him to release Cobb and give attention to McSwain; that he called for help and Mr. S. J. Stell, part owner of the club, responded and took charge of Cobb; that he began hitting McSwain with a blackjack over his back, and finally broke loose from him, after knocking him to the floor; that he then put the handcuff on Cobb's other arm, and conducted him to the car, he walking unassisted; that McSwain, then lying on the flat body of a small truck, was taken by the arm and shoved into the car; that he called two soldiers and a young man named Ray Nash to accompany them on the trip to the jail; that after reaching the jail, Sam Giglio, the jailer, unlocked the door and the two men were then put in a cell. He denied emphatically that he struck Cobb either in the club house, on the yard or on the trip to the jail.
Percy Straughan, who, with S. J. Stell, operated the club, testified that as he went into the dance hall a fight was in progress that centered around the table occupied by Cobb and his party, many, if not all of the participants being down on the floor; that he recognized Cobb and later learned that one of the participants was McSwain; that as the fighting reached its high peak, Marcotte arrived upon the scene; that he took charge of Cobb and carried him into the barroom and placed a handcuff on his right arm and left him with witness; that Marcotte, after having subdued McSwain, who had jumped on him, took charge of Cobb and they walked out of the building and to the car. Mr. Straughan returned to the dance hall and found the following damage had been done by the revelers, to-wit: two chairs broken, one table turned over and completely damaged, and a lot of broken bottles on the floor. He is positive that Marcotte did not strike Cobb in the building nor on the yard, and did not see anyone else do so.
The testimony of S. J. Stell corroborates that of Straughan in substance and detail. He heard Marcotte's call for help, responded and took charge of Cobb. He testified that Cobb was not struck by Marcotte. Herbert Stell, brother of J. T. Stell, was attending the bar the evening of May 16, 1942, and witnessed what happened after the battle was transferred from the dance hall into the barroom. His testimony tracks that of Straughan in every detail.
Ray Nash, who Marcotte says drove the car from the club house to the jail, testified that he was on the outside of the building and came to the barroom door while the fighting was in progress. He saw Marcotte and McSwain tusseling and fighting. He also saw Cobb with handcuff on, in charge of Straughan, and testified that as Marcotte came through the door with Cobb, he (Marcotte) asked that the witness accompany him on the trip to the jail; that Cobb occupied the rear seat with McSwain; that on reaching the jail Cobb walked into it of his own power, but that McSwain had to be helped in. He is positive Marcotte did not strike Cobb in his presence.
Horace Bouvais witnessed part of the barroom brawl and agrees with Straughan as to what then and there transpired. He saw Cobb standing near a table or chair in the barroom. He then returned to the dance hall and there learned that the *106 Deputy Sheriff had taken Cobb and McSwain to jail. Witness and his wife promptly drove to the jail and while there they talked with Cobb who asked for a package of cigarettes. These were gotten, but when he returned with them Cobb was in such mental condition that he could not be aroused to accept them. McSwain remarked that he "had just passed out" and would be all right.
Sam Giglio, the jailer, testified that he did not at the time know either of the men; that each got out of the car and walked into the jail unassisted. He said that the taller one (Cobb) "was fussing and going on", asked for a package of cigarettes, and requested that someone telephone and let "them" know he was in the Bunkie jail.
It will be readily observed from the foregoing epitome of the testimony of the witnesses of each side that there is an insurmountable conflict therein. Plaintiff's witnesses do not agree with each other, and to some extent that is true of the defendants' also.
Any theory that would be advanced to account for the skull of Cobb being fractured, other than that advanced by plaintiff, would be without support of positive testimony. Of course, it is possible, as intimated, that in the fight in the dance hall Cobb could have been struck by a chair in the hands of one of the belligerant soldiers, or he could have fallen and the wound, in that manner, been inflicted, but there is not a scintilla of positive testimony that either happened. The clear preponderance of the testimony supports the defense that Marcotte did not inflict the wound. It, therefore, is not necessary to determine how it occurred.
The credibility of three of plaintiff's witnesses is materially impaired. Gentry would have us believe that the difficulty between Cobb and Marcotte began in the gambling room. That this is untrue is abundantly proven. In addition, he was the only eyewitness who testified that Cobb was dragged by his feet from the building and over the yard. We believe this testimony absolutely false.
McSwain contradicted himself in several respects but of more damage to the worth of his testimony is found in Sheriff Jeansonne's testimony that when McSwain was searched in the jail the morning Cobb passed away, Cobb's rifled billfold was found on him.
The trial judge, for good reasons, rejected the testimony of the witness Milligan, and after due consideration we are not disposed to disagree with this finding.
The testimony of Mrs. Bryant is flatly contradicted by several witnesses who were in as favorable position to see what went on, as was she.
There is a circumstance that weighs heavily against the testimony of plaintiff's witnesses who say that Marcotte struck Cobb repeatedly upon and about the head with the blackjack. Had this been done, the head of the deceased would have been beaten into a pulp, whereas the autopsy revealed that only one wound thereto was made, and no other fractures, bruises, abrasions or contusions were revealed. There was no blood on or about the head, not even on the wound that caused death.
Dr. Hardy testified that had timely and appropriate surgical service been given Cobb, he would have had an excellent chance of surviving.
It is the duty of an arresting officer, regardless of the nature of the means employed to accomplish the arrest, and regardless of the nature of the offense for which the arrest is made, so long as the prisoner is in his custody or subject to his control, to see to it that reasonable medical service is provided to such person if and when his mental and/or physical condition discloses the need of such services. The law provides that each parish have a coroner whose duty it is to render medical services to prisoners in need of such.
In the present case it is made clear that the decedent and his companions imbibed somewhat heavily at the club; otherwise the rows would not likely have occurred. We have found from the conflicting testimony that Cobb left the club house and entered the car under his own power and *107 in like manner alighted from the car and went into the jail. To that time his actions and talk had not given evidence of the impending condition that would soon cause his death. To all appearances he seemed mentally normal save for such abstraction as naturally would follow drinking and fighting. He expressed the wish that someone inform someone else of his whereabouts. It is true that when the cigarettes were brought to him he had, supposedly, fallen asleep. McSwain, no doubt, did remark that he had "passed out", which, of course, meant that he was sleeping off a drunk.
Marcotte left the club house for his home around four o'clock the morning following the trouble and had no knowledge of Cobb's condition until he returned at 6:30 o'clock to take the two men to the parish jail at Marksville. It was then that he became aware of the fact that Cobb was in distress. A physician was summoned but arrived too late. The man was then dead, or nearly so. Therefore, the charge that Marcotte failed and refused to provide medical service to the deceased after realizing the need for so doing, is not substantiated by proof.
Straughan and the Stells, long ago, ceased to have any personal or financial interest in the Club Playtime. It has changed hands and the services of Marcotte were dispensed with by the new operators. These three witnesses traveled considerable distance to give their testimony in the case. Surely, there appears no semblance of reason why they should, at this late date, go to such trouble and inconvenience to perjure themselves. No good reason appears for defendants' other witnesses to color their testimony.
Of course, it follows that if Marcotte did not employ the blackjack on Cobb, in order to effect his arrest, it cannot be said that he used too violent and drastic means to do so.
The trial judge gave lengthy written reasons for his judgment. The trial covered the greater part of two days. He doubtless watched closely the appearance and demeanor of all of the witnesses as they testified, and is personally acquainted with all, or nearly all of them. His resolution of the questions of fact tendered in the case should not be disregarded unless manifestly erroneous. We do not find this to be true.
During the trial plaintiff's counsel offered in evidence an affidavit of one Richard Valentine, accredited as being present at the club house the night of May 16, 1942, who swore to certain facts concerning the use of the blackjack on Cobb by Marcotte, after the former had left the building. The offering was objected to by defendants' counsel, and the objection was sustained. At that time plaintiff's counsel stated that the ruling was excepted to and that formal bill of exception with affidavit attached would be presented to opposite counsel and trial judge for signature. In brief they say that after presenting the bill of exception to opposing counsel for their perusal, same was then delivered to the judge, but not been heard from since. It is not in the record.
In passing, regardless of the fact that the affidavit is not before us, we, will say that an ex parte document of this kind is not admissible in evidence, even after the death of the affiant, which we are informed happened in this case. To hold otherwise would effectively deprive the opposition of the right to be confronted by the witness and of cross-examining him.
For the reasons herein assigned, the judgment from which appealed is affirmed with costs.