430 So.2d 1099 (1983)
Helen Poole ABRAHAM, Individually and as Natural Tutrix of Her Minor Child, Tonya Louise Abraham and Juanita Davis Abraham, as Natural Tutrix of Her Minor Child, Alex Wayne Abraham
v.
Officer K. MAES, Officer S.M. King, Officer F. Sims, New Orleans Police Department and the City of New Orleans.
No. CA-0379.
Court of Appeal of Louisiana, Fourth Circuit.
April 4, 1983.
Rehearing Denied May 24, 1983.
Rainer Lorenz, Zelden & Zelden, New Orleans, for plaintiffs-appellants.
Avis Marie Russell, Douglas P. Wilson, Salvador Anzelmo, New Orleans, for defendants-appellees.
*1100 Before GULOTTA, BARRY and LOBRANO, JJ.
BARRY, Judge.
Plaintiff appeals the dismissal of her lawsuit seeking damages for her husband's death due to the alleged negligence of several police officers[1].
The facts are essentially undisputed. About 8:00 a.m. on Saturday, June 18, 1977 Police Officers Maes and Drouant were notified by the dispatcher that a man was in the Palmetto Street Canal. When they arrived at the scene the officers found a man who appeared to be asleep or in a drunken stupor lying face down on the dry cement area near the bottom of the canal. There was a bottle (hard liquor or a quart of beer) beside him and the policemen noticed a strong smell of alcohol on his breath and on his disheveled clothing. The officers observed no visible injuries; however, they summoned an emergency unit and two paramedics arrived a few minutes later, examined the man, and found nothing which required medical treatment.
Although his speech was slurred and he was somewhat incoherent, the man was able to tell the police his last name was Abraham and he lived on Eagle Street. Mr. Abraham did not explain how he got into the canal and did not complain of any pain or injuries. According to one of the officers, Mr. Abraham said he'd been drinking and his wife would be angry with him for being out late. The police walked him up the bank and put him in the squad car to take him home. When they arrived at Eagle Street, however, Mr. Abraham was unable to point out his house or tell the police his address. The patrolmen then decided to take him to Central Lockup and book him with "Drunk in Public."
After arrival at Central Lockup around 8:39 a.m. the patrolmen delivered Mr. Abraham with the arrest paperwork to Officer Sims, the search-doorman on duty. It was Sims' responsibility to weigh incoming prisoners, search them for weapons, and check for injuries or any need for medical attention. Sims apparently did not notice any injuries on Mr. Abraham and placed him in the holding cell with a large number of others waiting to be booked. The cell was equipped with drinking fountains, a lavatory, benches, a telephone, and is lighted 24 hours a day.
Due to overcrowding, understaffing, and a problem with the computer, Mr. Abraham remained in the holding cell almost nine hours before he was booked at approximately five that afternoon. During that time Sims was stationed about 15 feet away and made periodic checks of the cell. Mr. Abraham was then moved to another cell on the 8th floor. Sometime during this period Sims noted "CX" on the prisoner route sheet, a shorthand notation for "coroner's examination", because he noticed strange or bizarre behavior indicating a possible mental problem.
At 5:15 p.m. during the booking process, Sgt. King, the booking officer, noted Mr. Abraham had a cut on his lip and a bruise on the back of his neck. She couldn't recall if she had observed those injuries or if Sims had pointed them out.
Mrs. Abraham, the plaintiff, arrived at Central Lockup about 6:30 p.m. and posted bond. When Mr. Abraham was released he didn't recognize his wife. She noticed his eyes were big and puffy and there was a bruise on the back of his neck. Mr. Abraham walked out of jail and did not appear to be in pain, but was disoriented, mumbled unintelligibly, and didn't recognize his relatives. Mrs. Abraham thought her husband would be alright if he lay down a while, so she brought him home. He continued to behave strangely and after bathing and dressing him, she and some relatives drove him to Charity Hospital.
Mr. Abraham was admitted to Charity at about 8:00 p.m. The admit sheet indicates he had a drinking problem, but Mrs. Abraham and other relatives who were there denied giving the receptionist any such history. *1101 X-rays of the skull were negative and the doctors ruled out trauma as the cause of his behavior. However, several hours later a neurosurgeon diagnosed a massive intracerebral hemorrhage and linear skull fracture. By midnight Mr. Abraham was in a coma and he died the next afternoon. The autopsy report showed Mr. Abraham had small abrasions on his elbow, shoulder, and neck.
Plaintiff argues the arresting officers were negligent in failing to realize Mr. Abraham may have been seriously injured and in taking him to jail rather than to a hospital. Mrs. Abraham also contends the doorman and booking officers at Central Lockup were negligent in failing to observe Mr. Abraham's condition and furnish medical assistance. Liability of the City of New Orleans is premised upon respondeat superior.
Plaintiff cites several cases for the proposition that a police officer owes a duty to a person in his custody to protect him from injury and to care for his safety. We agree that a policeman must exercise reasonable care to preserve the safety of his prisoner. Griffis v. Travelers Insurance Co., 273 So.2d 523 (La.1973). We also agree that a policeman owes a higher degree of care to an intoxicated person than to one who is more capable of caring for himself. Barlow v. City of New Orleans, 257 La. 91, 241 So.2d 501 (1970)[2]. The application of these principles was explained in Griffis, supra, at 526:
We start with the basic premise that a police officer owes a duty to his prisoner to save him from harm. See 41 Am.Jur. Prisons and Prisoners, Sec. 12, Barlow v. City of New Orleans, 257 La. 91, 241 So.2d 501 (1970). However, this means that the officer must do only what is reasonable under the circumstances, and he is only liable for a certain category of risks to which his prisoner may be subjected.... [A]ssuming that the officer is under the duty to save the prisoner from this risk, all that is required of the officer is that he do what is reasonable to avoid the risk. He is not an insurer of the safety of the prisoner merely because the prisoner is intoxicated.
The Griffis court then held the police were not liable for injuries to an intoxicated prisoner who had been searched but had obtained matches from another inmate and started a fire in his cell.
Plaintiff's reliance on Tompkins v. Kenner Police Department, 402 So.2d 276 (La. App. 4th Cir.1981) is misplaced. There an investigating police officer allegedly failed to notice a body on the side of a road and did not seek medical help. Those facts are clearly inapplicable here. Also, Horsthemke v. New Orleans Ry. & Light Co., 146 La. 931, 84 So. 210 (1920) concerning a streetcar conductor's duty of "due regard" toward an intoxicated passenger who was thrown off the vehicle, doesn't apply here.
The responsibility of the police to provide medical assistance to an incarcerated person was delineated in State ex rel Brown v. Bailes, 247 So.2d 625, 627 (La.App. 2d Cir. 1971) which stated:
In jails or places of detention housing such a few prisoners that it is not necessary to provide hospital quarters as required by LSA-R.S. 15:760, it is the duty of the person in charge to transfer a sick prisoner to the nearest medical facility for treatment and hospitalization, if necessary. State v. Brouillette (In re Brouillette), Supreme Court of Louisiana, 163 La. 46, 111 So. 491.
In Burns v. Town of Leesville, 383 So.2d 109 (La.App. 3d Cir.1980), the plaintiff was arrested on a charge of public drunkenness and fell from the top bunk bed in his jail cell several hours later. According to plaintiff and two other inmates, he requested medical help several times but received none. The jailers on duty denied the plaintiff had made any such request. The Third Circuit affirmed a finding in favor of the *1102 defendant municipality, based on the lower court's factual finding that the plaintiff had not asked for medical treatment. Implicit in such a holding was the finding that the jailers were not negligent in failing to observe plaintiff's condition and to procure medical assistance on their own initiative.
Cobb v. Jeansonne, 50 So.2d 100 (La.App. 2d Cir.1951), involved an intoxicated person who died in jail from a cerebral hemorrhage resulting from a fractured skull. The decedent in Cobb had been involved in a barroom brawl and was arrested for disturbing the peace. While the court in Cobb did not believe testimony that the deputy repeatedly bludgeoned the decedent with a blackjack, it was obvious the decedent had been actively involved in a fight in which tables and chairs were overturned and numerous bottles were broken. Instead of taking his prisoner to the hospital, the deputy sheriff jailed him. The severity of the prisoner's condition was not recognized until the next morning, when it was too late to save his life. The court in Cobb discussed the responsibility of the police to provide medical aid:
It is the duty of an arresting officer, regardless of the nature of the means employed to accomplish the arrest, and regardless of the nature of the offense for which the arrest is made, so long as the prisoner is in his custody or subject to his control, to see to it that reasonable medical service is provided to such person if and when his mental and/or physical condition discloses the need of such services. The law provides that each parish have a coroner whose duty it is to render medical services to prisoners in need of such. 50 So.2d at 106.
Although the Cobb decedent had been drinking, fighting, and had apparently "passed out" in jail, the court found the sheriffs were not unreasonable in failing to procure medical treatment that night. The court pointed out the decedent had walked into jail under his own power, requested cigarettes, and asked that someone be notified of his whereabouts. The court noted:
To that time his actions and talk had not given evidence of the impending condition that would soon cause his death. To all appearances he seemed mentally normal save for such abstraction as naturally would follow drinking and fighting. 50 So.2d at 107.
The defendant police officers in this case had far less reason than the sheriff in Cobb to suspect the possibility of a fractured skull. Two paramedics, as well as the defendant patrolmen, examined Mr. Abraham and found no obvious injuries, certainly nothing to even hint of a fractured skull. The subject looked, smelled talked, and acted as thought he was heavily intoxicated. The location where he was found was frequented by vagrants. The police found a bottle lying next to Mr. Abraham; he told the officers he had been drinking but didn't mention he had fallen into the canal, been mugged, or otherwise injured. The canal slopped at an angle that permitted the patrolmen, the paramedics, and presumably Mr. Abraham to walk down and up the bank without falling.
The medical testimony indicates Mr. Abraham's condition and symptoms would simulate drunkenness. The expert testimony established the effect of Mr. Abraham's injury would manifest itself in progressively more abnormal behavior, so that his conduct when first seen by the police was less unusual than his behavior when he was released hours later. The "CX" notation on the prisoner route sheet was apparently made when Mr. Abraham was being moved shortly before or after booking, only an hour or so before his release. The "CX" didn't indicate any physical emergency, denoting rather the need for psychiatric evaluation. Mr. Abraham's wife did not realize his condition required medical help until more than an hour after his release, and then only after his condition began to rapidly deteriorate. Even the physicians at Charity initially ruled out trauma as the cause of Mr. Abraham's problem, presumably finding the slight lip and neck bruises insignificant. From all of this it appears only a psychic layman could have known the closed skull injury existed.
*1103 The Trial Judge found that "... under all of the circumstances, and the medical testimony concerning the effects of this type of injury on the actions and personality of the deceased ... the defendants did not act unreasonably or negligently. This is a most unfortunate incident, however, this Court can not find the officers' performance was substandard."
We find under the facts in the instant case the officers did not breach any duty owed to Mr. Abraham. They did all that could have been expected under these circumstances. ACCORDINGLY, the judgment of the district court is affirmed, appellant to pay all costs.
AFFIRMED.
NOTES
[1] By amended petition plaintiff also sued the State, Charity Hospital and several of its doctors, but these claims were compromised and the parties dismissed.
[2] Recovery was allowed in Barlow where officers left an arrested intoxicated person unattended in a locked police vehicle. The prisoner's injury occurred after his arrest while in custody.