535 So.2d 1006 (1988)
Lynda Ann AYCOCK, et al., Plaintiffs-Appellants,
v.
CITY OF SHREVEPORT, Defendant-Appellee.
No. 19955-CA.
Court of Appeal of Louisiana, Second Circuit.
October 26, 1988.
Writ Denied January 13, 1989.
*1008 Nelson, Hammons & Johnson by John L. Hammons, Shreveport, for plaintiffs-appellants.
Charles C. Grubb, City Atty., L. Edwin Greer, Shreveport, for defendant-appellee.
Before JASPER E. JONES, NORRIS and LINDSAY, JJ.
LINDSAY, Judge.
The plaintiffs appeal from a trial court judgment denying recovery in their tort action, which arose from the death of their father shortly after his release from the custody of the police department of the defendant City of Shreveport. For the reasons assigned below, we affirm the judgment of the trial court.

FACTS
At approximately 11:55 a.m. on April 11, 1985, Wayne J. Aycock was involved in a two-vehicle accident a few houses down from his residence on West Cavett in Shreveport, Louisiana. Mr. Aycock, who was proceeding south on the two-way undivided street, crossed from his lane of traffic. His 1977 Buick LeSabre struck a pickup truck parked on the opposite side of the street. The truck, which was owned by Mr. Aycock's neighbor, Larry G. Wilson, was parked partially off the road on the east side of the street and was facing north. The impact knocked the truck ten to twelve feet back and punctured the left front tire. According to Mr. Wilson's account, he was inside his home and he heard a loud crash. Looking out his kitchen window, he saw Mr. Aycock back his car up and then begin to drive away. However, after a neighbor yelled at him, Mr. Aycock stopped his car and got out.
Officer Susan Wells responded to a code 52 (minor accident) call and arrived on the scene at 12:10 p.m. She found that both of the vehicles had suffered moderate to heavy damage to the front on the driver's side. She testified that when she inspected the Aycock vehicle its windshield was not broken.
Officer Wells spoke to Mr. Aycock and Mr. Wilson. She stated that she observed Mr. Aycock as she was writing her report. She noticed that he was unsteady on his feet. She asked him if he was all right. He responded that he was. She further inquired if he had struck his head or chest, or if he was taking medication that might make him unsteady. He replied negatively to both questions. Upon further questioning, he admitted that he had consumed two beers earlier in the morning, that he had taken Maxzide, a high blood pressure medication which he had been instructed not to take with alcohol, and that he had also taken a Valium tablet. Both Officer Wells and Mr. Wilson observed that Mr. Aycock was unsteady on his feet and his speech was slurred. Officer Wells testified that she detected the smell of alcohol on Mr. Aycock's breath. Mr. Wilson testified in his deposition that he did not smell any alcohol, but that Mr. Aycock appeared to be drunk.
Officer Wells requested a radio check on Mr. Aycock's driver's license. She was informed that Mr. Aycock had a previous DWI conviction. Thereafter, she placed Mr. Aycock under arrest for DWI-2nd offense. She then transported him to the selective enforcement traffic division offices where DWI testing was conducted.
Sergeant Clinton Rambin, Jr. made the decision to administer a blood test to Mr. Aycock to determine his blood alcohol level. The record indicates that the blood was collected at 1:39 p.m. and was delivered to the North Louisiana Criminalistics Laboratory at 1:58 p.m. (The results were received *1009 several days later and showed a blood alcohol level of 0.04%.)
Mr. Aycock also participated in a video taped field sobriety test. Officer Wells and Sergeant Rambin testified that he performed poorly. His balance was off, and he seemed hesitant. Mr. Aycock was allowed to sit down after he indicated that he had a "problem" with his leg.
Mr. Aycock was photographed and fingerprinted. After the paperwork was completed, he was taken to the jail. Jailer LeRoy Hines testified that Mr. Aycock's apparent intoxication prompted him to place him in a cell with some other prisoners who could watch him and make sure he was all right. Officer Wells, Sergeant Rambin, and Sergeant Jerry L. Johnson all testified that they detected a noticeable smell of alcohol on Mr. Aycock's breath. They and jailer Hines agreed that he appeared intoxicated, but he was coherent and had no visible cuts or bruises.
Mr. Aycock was released from jail later in the afternoon. At about 5:00 a.m. on the morning of April 12, 1985, the police department responded to a possible deceased person call at the Aycock residence. According to the report filed by Officer William E. Scott, Mrs. Mary Aycock told him that she had last seen her husband alive at about "2030 hours" or 8:30 p.m. the night before. When they were retiring, he fell on the hallway floor at the bathroom entrance. Mr. Aycock told his wife that he would be all right laying on the floor. Mrs. Aycock tried to contact Dr. W.M. Allums, their family physician. However, she was unable to reach him. Instead, she talked to a Dr. Russell, who assured her that her husband would be all right, but said to bring him in if he got worse. At about 5:00 a.m., Mrs. Aycock got up and found that she could not wake her husband and that he felt cool. She then summoned the Shreveport Fire Department.
Due to the suddenness and unexpected nature of Mr. Aycock's death, an autopsy was performed by Caddo Parish Coroner George M. McCormick, M.D. The results of the autopsy demonstrated the cause of death was cardiorespiratory failure due to pontine hemorrhage in the brain.
The plaintiffs, Mr. Aycock's adult children from his first marriage, filed suit against the City of Shreveport. (Mr. Aycock's widow and second wife, Mary Aycock, died two weeks after his death.) The plaintiffs alleged that the Shreveport Police Department breached its duty to obtain medical care for their father, who displayed symptoms of a closed head injury after the automobile accident. They asserted that their father suffered serious injuries to his face, head, and arms which were clearly visible. The plaintiffs contended that the defendant's failure to provide immediate medical attention was the cause in fact of their father's death. The City answered, denying that it was at fault and asserting Mr. Aycock's comparative negligence and assumption of the risk.
Trial was held on November 19 and 20, 1987. The parties entered into a stipulation of the basic facts and submitted depositions in lieu of the testimony of five witnesses. These witnesses were Dr. Allums, the Aycock family physician; Charles M. Atwood, an employee of Acme Glass Company; Cliff Heap, the Shreveport Chief of Police; Mr. Wilson, the owner of the truck struck by Mr. Aycock; and LeRoy Hines, the jailer.
The plaintiffs contended that Mr. Aycock hit his head against the windshield, injuring himself and shattering the glass. They endeavored to prove that the police were negligent in their investigation of the accident and in their treatment of Mr. Aycock. They also sought to prove that the police performed the wrong test to determine Mr. Aycock's suspected intoxication.
At the conclusion of the live testimony, the trial court rendered an oral decision which rejected the demands of the plaintiffs. The court found that the decedent had been subjected to two different episodes on April 11ththe car wreck and a fall at home at about 8:30 p.m. The Court further found that the actions of the police officers were not unreasonable as Mr. Aycock was not visibly injured; he admitted consumption of two beers and a Valium pill *1010 earlier in the day; and he was displaying all the classic signs of intoxication.
In arriving at his decision, the trial court expressed dissatisfaction with the testimony of Dr. McCormick, who relied upon the "debated" aging of wounds theory. The court stated that Dr. McCormick's assertions that Mr. Aycock was injured in the wreck and that these injuries caused his death were uncorroborated.
At the conclusion of the trial court's oral ruling, plaintiffs' counsel inquired if the court had read the deposition of Dr. Allums, which he felt corroborated Dr. McCormick's testimony. The court replied that it had not. A brief recess was called after which the court stated that nothing in the deposition had changed his opinion. (The court had also not read the depositions of the other four witnesses.) A judgment in conformity with the trial court's decision was signed on December 9, 1987.
The plaintiffs appealed. They assert eleven assignments of error. The first two of these assignments concern the allegedly improper conduct of the trial court judge. The remaining assignments of error concern the merits of the case and the plaintiffs' burden of proof. Several assignments are closely connected and are thus discussed together. Because of our ultimate ruling on liability, we find it unnecessary to discuss their final assignment, which deals with quantum.

ASSIGNMENTS NO. 1 AND NO. 2
The plaintiffs first and second assignments of error concern allegations of improper behavior and lack of impartiality on the part of the trial court which allegedly deprived them of due process.
Specifically, the plaintiffs assert that prior to trial the court directed the attorneys to "trim down" the length of the trial. Consequently, the attorneys for both sides prepared a written stipulation of undisputed facts and submitted various depositions and documents in lieu of the testimony of several witnesses. Then, at the conclusion of the live testimony, the trial court rendered an oral opinion without reading any of the submitted exhibits. The plaintiffs argue that the trial court's conduct constituted a breach of his obligation to be impartial and fair, and deprived them of their constitutional rights to due process of law. Furthermore, the plaintiffs assert that the appellate court should disregard the trial court's findings of fact and conclusions of law, and not apply the "manifest error doctrine" of Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
The record contains no evidence to support the plaintiffs' allegations that the trial court required the parties to streamline their presentations. Counsel for plaintiffs made no objection on the record at the beginning of trial as to the trial court's behavior in pre-trial conferences.
However, the record does reveal that the trial court did not review all the evidence before rendering his oral opinion. The depositions were properly submitted into evidence. Failure to consider this evidence was error. Nonetheless, we find that under the facts of this case the trial court's action constituted harmless error.
The depositions contained considerable information which was not helpful to the plaintiffs' case. In his deposition, Dr. Allums' testified that Mr. Aycock suffered from organic brain syndrome as a result of his excessive alcoholism. He also had hypothyroidism and hypertension. Dr. Allums indicated that the symptoms of organic brain syndrome and hypothyroidism could mislead even a doctor to believe that a person was intoxicated. Mr. Aycock was taking Lopressor and Maxzide for hypertension, Valium for nervousness, and Vertabs for dizziness and vertigo. Dr. Allums testified that his files contained a notation indicating that on the night before his death, Mr. Aycock resumed drinking several beers, got sick and "fainted on the floor." The notation also stated "His wife could not get him to bed, but this morning got up at 5 a.m. and found him dead."
In his deposition, Acme Glass employee Charles Atwood testified that he examined the Aycock vehicle, and he found that the windshield was broken from the outside.
*1011 Chief Heap testified that the police department had no specific policy on which DWI test to administer. However, if drugs are suspected, blood tests are conducted because only alcohol will register on a breath test. He further explained that the video tape of Mr. Aycock's sobriety test was unavailable because tapes are generally erased and used again after the criminal charges have been disposed of conclusively.
Mr. Wilson's testimony indicated that Mr. Aycock appeared drunk, and that he initially denied drinking anything. He also repeatedly proclaimed to be all right the several times he was asked about whether he wanted medical attention.
Jailer Hines testified in his deposition that Mr. Aycock appeared intoxicated and nervous. Also, special efforts were made by jail personnel to allow him to call someone to arrange for bail.
The information contained in the depositions primarily benefited the City of Shreveport. Had the trial court read all this documentation, it would have only served to confirm his decision that the plaintiffs were not entitled to recover. (In fact, the trial court properly found that the contents of Dr. Allums' depositions did not alter his conclusions.)
Additionally, the plaintiffs argue that during the trial the trial court cross-examined Officer Wells and Dr. McCormick as to matters not raised by counsel, and that he interfered with the presentation of the plaintiffs' case.
While Officer Wells was on the witness stand, the court asked "for clarification only" whether she had testified as to any smell of alcohol on Mr. Aycock's breath.[1] Officer Wells had been called under cross-examination by the plaintiffs during their case in chief. Contrary to the plaintiffs' statement in their brief that the issue of whether there was a detectable odor of alcohol on Mr. Aycock's breath had not been the subject of inquiry prior to that point, Officer Wells had previously been asked by plaintiffs' counsel whether Mr. Wilson had advised her that he did not detect alcohol on Mr. Aycock's breath. In view of this fact, we find the trial court's request for clarification to be understandable. Rather than demonstrating a lack of impartiality on his part, it shows a desire to be thorough and to ensure that his notes were accurate.
The plaintiffs further complain of the trial judge's queries to Dr. McCormick at the end of the defendant's cross-examination:
The Court: Doctor, for clarification purposes only, and for no other reason, at the outset of your testimony you made reference to aging of wounds as being a disputed but accepted method if I remember your language correctly.
The witness: Yes, sir.
The Court: May I ask youdisputed by whom, please?
The witness: Sure.
The Court: Doctor, what I am trying to get to here is as an expert witness I have to know what facts you base your opinions on and in this instance this may or may not beit may well be a significant area. I don't know what other witnesses may be testifying. I know I went through this with you in another trial and with another witness in that instance. I want to be absolutely certain that I understand. Who disputes it and who accepts it? I guess that is what I am trying to say.
Inasmuch as the doctor himself had admitted that "aging of wounds" was subject to debate, we find no error in the trial court's efforts to obtain clarification of that admission. Again, we believe the trial court was attempting to ensure that his understanding of the matter was thorough.
The plaintiffs also contend that the trial court erred in making irrelevant comments *1012 concerning Dr. McCormick's testimony in another case involving the aging of wounds theory. Dr. McCormick had been asked a question about whether a police officer would be negligent under certain facts. The defendant objected. The objection was sustained because the question called for an answer which invaded the province of the court. The court went on to add that:
"Dr. McCormick recently, for the purpose of this recordfor the purpose of this record, recently testified in a case involving the death of a baby, at which another forensic pathologist likewise testified. The court is aware that when Dr. McCormick made the comment earlier about there is a dispute but there is acceptance of aging of wounds, a matter of great concern in that particular case. In any event, the fact remains that it must be determined by the fact finder and ultimately by the judge who is the fact finder, and that is the opinion that is called on here. And I have made my ruling."
We believe the trial court's comments in this instance to be unnecessary. However, we do not find them to be prejudicial, and they do not constitute reversible error. The trial court was expressing its awareness that Dr. McCormick was accurate in portraying the theory of aging of wounds as a somewhat debated matter. We do not believe the statements indicate the trial judge was trying to impeach the "uncontroverted" testimony of a witness. (Dr. McCormick's testimony will be discussed hereafter in more detail.)
The conduct complained of in these assignments of error does not rise to the level of reversible error.

ASSIGNMENTS OF ERROR NO. 3 AND NO. 6
In assignments of error No. 3 and No. 6, the plaintiffs assert that the trial court erred in overruling their objection to the introduction of hearsay evidence contained in Officer Scott's report and in accepting the evidence as fact. Officer Scott was called to the Aycock home on the morning of April 12th, and he apparently interviewed Mrs. Aycock concerning Mr. Aycock's death. The hearsay complained of is the recitation of Mrs. Aycock's statement that her husband fell on the night of April 11th. The plaintiffs objected to the defendant referring to the fall while presenting a hypothetical question to Dr. McCormick.
The offense report was submitted into evidence as joint Exhibit # 2. The stipulation filed into the record and agreed to by the parties provided:
"The offense report prepared by Officer Scott will be submitted in lieu of his testimony."
The report was admitted in evidence to explain the conduct and results of Officer Scott's investigation at the Aycock's residence. The plaintiffs failed to make any reservations as to the report's admission. Therefore, they are deemed to have waived their hearsay objection to its contents. The trial court properly accepted the evidence of the fall, which was corroborated by Dr. Allums' reference to a fall in his deposition.
These assignments of error are meritless.

ASSIGNMENT OF ERROR NO. 4
The plaintiffs argue that the trial court erred in considering the opinion testimony of Mr. Ray Herd, claiming that he was never qualified as an expert in accident reconstruction.
Mr. Herd, the director of the North Louisiana Criminalistics Laboratory, prepared a report in which he concluded that the crack in the windshield of the Aycock car could not have been caused by the driver's head striking the windshield. The report was admitted into evidence as joint Exhibit # 9 in lieu of Mr. Herd's testimony pursuant to the stipulation. A supplemental stipulation was entered into by counsel for both sides which specifically provided "that the Court may take judicial notice of the qualifications of Ray Herd, Director of the North Louisiana Criminalistics Laboratory, to express the opinions discussed in his report of May 6, 1986."
*1013 A stipulation is a judicial confession and amounts to full proof against those who made it. LSA-C.C. Art. 1853. Although written stipulations cannot affect the powers, duties, and prerogative of the court, stipulations become the law of the case and must be enforced. Lockett v. Home Insurance Company, 413 So.2d 230 (La.App. 4th Cir.1982).
Based upon the stipulations, we find that Mr. Herd was properly qualified by agreement of the parties. This assignment lacks merit.

ASSIGNMENT OF ERROR NO. 5
The plaintiffs contend that the trial court erred in failing to find that Officer Wells was grossly negligent in her investigation of the accident because she did not observe the allegedly shattered windshield of the Aycock vehicle.
Our examination of the record reveals that the plaintiffs failed to establish that the windshield was broken as a result of the accident. Officer Wells was shown photographs of the crack in the windshield. She testified that such a crack was not present when she inspected the car, and that she would have noticed it if it had been there. Mr. Wilson, who was also present at the accident scene, could not say whether the crack was present because he did not venture over to the spot where Mr. Aycock eventually stopped his car.
Mr. Aycock's daughter, Lynda, testified that she first saw her father's car on the Monday following her father's accident on Thursday. By that time, the vehicle had been moved by someone from West Cavett Street, where Mr. Aycock was apparently temporarily renting a house, to Merrick Street, where it was parked behind Mr. Aycock's new residence.
Additionally, we observe another important factor. Accident reconstruction expert Ray Herd stated in his report that the outside layer of the windshield glass was broken and that the break was caused by a force from the outside. Mr. Atwood of Acme Glass Company also concluded that the windshield was broken from the outside. Such is contrary to the plaintiffs' assertion that Mr. Aycock struck his head against the windshield, thus shattering it and injuring him.[2]
Based on the foregoing, the plaintiffs clearly failed to prove that the windshield was broken in the course of the accident. The testimony of Officer Wells was corroborated by the testimony of several witnesses. Therefore, we cannot say that the trial court erred in not finding Officer Wells negligent in her investigation of the accident.
This assignment of error is meritless.

ASSIGNMENTS OF ERROR NO. 7 AND NO. 9
Assignments of error no. 7 and no. 9 will be discussed together as both concern Dr. McCormick's testimony and the causal connexity between the accident and Mr. Aycock's death. In the first of these assignments, plaintiffs argue that the trial court erred in not finding Dr. McCormick's "aging of wounds" theory to be persuasive evidence that Mr. Aycock received the closed-head injury which caused his death in the automobile accident. In the second assignment, plaintiffs assert that the trial court erred in holding that they failed to carry their burden of proving that Mr. *1014 Aycock was injured in the wreck and that those injuries led to his death.
Dr. McCormick testified that Mr. Aycock sustained a large underlying bruise or hemorrhage on the right side of his brain which caused severe swelling of the brain and eventually led to compression of the pons, which is the part of the brain that goes to the spinal cord and controls the heart and the lungs. The damage to the pons led to cardiorespiratory failure and, ultimately, death. Dr. McCormick testified that it was his opinion that Mr. Aycock struck the windshield of his car during the accident, thus bruising his scalp and brain, and sustaining a closed-head injury. He further testified that the symptoms of such an injury include disorientation, dulled senses, disturbances in gait or balance, and problems in performing coordinated movements on command. He added that slurred, or loss of, speech was possible, and that the symptoms could have been mistaken for signs of intoxication.
Dr. McCormick went into detail describing how the "spider web crack" in the windshield was totally consistent with Mr. Aycock's head having struck the windshield from inside the car. He declared that the impact between the head and the windshield or some other hard surface caused the brain injury to a reasonable certainty. He also testified that medical treatment could not have prevented the brain hemorrhage, but it might have limited its effects and made death less likely.
As to the "aging of wounds" theory, the doctor explained that it was the method of aging a wound by examining it under a microscope to look for the time before death that it was produced. The method gave "rough parameters" to use in determining the age of the wound. He further stated that the method was "medically debated but approved." He admitted that it was "an active area of research. There is no one accepted standard. Everybody does it to the degree thatthat is, ages wounds to the degree that their individual experience lets them do it."
On cross-examination, Dr. McCormick conceded that he had miscalculated the time of death by using 10:30 p.m. as the last time Mr. Aycock was seen alive, when the actual time was 8:30 p.m. He also stated that he had given Mr. Herd's report on the windshield no credence. The doctor testified that brain injuries like Mr. Aycock's could be caused by a fall. However, based upon his aging of the wounds, he did not believe the wound was consistent with the fall Mr. Aycock sustained the night of the accident. He was of the opinion that microscopically the bruise in the brain was six to twelve hours in age, and thus consistent with the car wreck.
We find no error in the trial court's finding that the plaintiffs failed to prove the causal connection by a preponderance of the evidence. In evaluating the evidence, the trier of facts should accept as true the uncontradicted testimony of a witness, even though the witness is a party, where the record indicates no sound reason for its rejection. Robertson v. Scanio Produce, 449 So.2d 459 (La.1984). One sound reason for rejection is where circumstances cast doubt on the reliability of the testimony. West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979). See Lloyd v. City Products Corp., 486 So.2d 953 (La.App. 1st Cir.1986).
Dr. McCormick testified, when questioned about Mr. Aycock's bruises, that "there is not medical information nor medical knowledge that would indicate that these bruises should not have been immediately visible. They were produced in the wreck. We could tell that by aging microscopically the bruises in the scalp. So that they were the same age before death as the hemorrhage in the brain. And there is no reason for them not to be visible as they were formed." However, the testimony of the witnesses establish that after the accident, the bruises on Mr. Aycock's face were not visible while he was in police custody. This is corroborated by the "mugshots" taken of Mr. Aycock while he was in custody and which were admitted into evidence. Dr. McCormick was apparently in error on this point, which was closely related to the issue of his assessment of the aging of wounds. Dr. McCormick *1015 conceded that the theory was debated, and that no one standard was accepted. Consequently, the trial court could properly maintain reservations on the validity of his testimony concerning the aging of the hemorrhage.
Additionally, we note that Dr. McCormick was quite specific that Mr. Aycock's head injury was consistent with the shattered windshield. His opinion on the shattering of the windshield was directly contrary to that of Mr. Ray Herd. The parties agreed to allow the court to take judicial notice of Mr. Herd's qualifications as an expert in accident reconstruction. He specifically concluded that the windshield could not have been damaged by impact with the driver's head. (His statements were bolstered by the findings of the Acme Glass employee.)
We find that there was sufficient other evidence on these issues to cast doubt upon Dr. McCormick's testimony. In view of these factors, we cannot say his testimony was "uncontroverted". Nor can we find that Dr. Allums' testimony corroborated Dr. McCormick's findings. Although Dr. Allums expressed his opinion that Mr. Aycock's fatal injuries arose from the car accident, he had not examined Mr. Aycock for several months before the accident. Nor did he examine Mr. Aycock after the accident or after his death. Actually, Dr. Allums simply assumed that Mr. Aycock's injuries resulted from the car wreck. Thus, Dr. Allums' belief as to the cause of Mr. Aycock's death cannot be considered well supported.
Given the foregoing, we find these assignments of error to be meritless.

ASSIGNMENT OF ERROR NO. 8
The plaintiffs argue that the trial court erred in holding that the test for intoxication used by the police was not causally related to Mr. Aycock's death. They contend that the delays involved in receiving the blood test results prevented Mr. Aycock from being released earlier. Also they claimed that Dr. McCormick established that the proper test to determine the amount of Valium in a person's body is a urinalysis, not a blood test. They further contend that a breathalyzer test would have yielded almost immediate results, and would have demonstrated that Mr. Aycock was injured, not drunk.
Contrary to the plaintiffs' contentions, Dr. McCormick did not testify that a blood test would fail to obtain the desired information on the presence of Valium. He testified, "If it is important for you to get the actual level of Valium then you would analyze the blood." He indicated that his belief was that it was only necessary to establish the presence of drugs, rather than the amount of drugs, to support a DWI charge, and thus a urine test to detect the mere presence of the Valium would be sufficient. However, the length of time necessary to obtain the results of a urine test was not established. Presumably, the time would be the same.
Furthermore, we disagree with the plaintiffs' contentions that the immediate test results of a breathalizer would have put the police on notice that Mr. Aycock was injured. The breathalizer test would not have detected the drugs which Mr. Aycock admitted consuming. The police still would not have been able to make any determination as to whether he was under the influence of drugs. Mr. Aycock admitted to Officer Wells that he had consumed two beers and Maxzide, which he had been told not to mix with alcohol. The possible interaction between these two agents, and the Valium, could have easily accounted for his impaired condition.
Consequently, we agree with the trial court that the police did not act improperly in seeking a blood test. The assignment of error is meritless.

ASSIGNMENT OF ERROR NO. 10
In this last assignment of error, the plaintiffs argue that the trial court erred in failing to find that the police breached their duty to provide Mr. Aycock with appropriate medical attention.
A police officer must exercise reasonable care to preserve the safety of the person in his custody. Additionally, a *1016 police officer owes a higher degree of care to an intoxicated person than to one who is more capable of caring for himself. Abraham v. Maes, 430 So.2d 1099 (La.App. 4th Cir.1983). It is the duty of an arresting officer to see that reasonable medical service is provided to his prisoner if and when his mental and/or physical condition discloses the need of such services. Cobb v. Jeansonne, 50 So.2d 100 (La.App. 2d Cir. 1951); Abraham, supra.
Assuming arguendo that Mr. Aycock received a closed-head injury in the auto accident, we nonetheless find that the police officers acted reasonably. Officer Wells visually assessed Mr. Aycock's appearance at the scene of the accident. He displayed the classic signs of intoxication. After detecting alcohol on his breath, she inquired if he was a diabetic because she knew insulin shots could produce the same smell of alcohol. She asked him several times if he was all right or needed medical assistance. Mr. Aycock was coherent, and could understand questions and give appropriate answers. He replied that he was fine and did not require assistance.
Sergeant Rambin, who dealt with DWI suspects several times daily for two and one-half years, was in Mr. Aycock's presence for thirty to forty-five minutes. He concluded that Mr. Aycock was intoxicated. Following his standard procedures, Sergeant Rambin twice asked him if he needed medical assistance. During the field sobriety test, Mr. Aycock was allowed to sit down because of some difficulty with his leg. However, he indicated to Sergeant Rambin that he had had problems with that leg for a long time. Mr. Aycock did not indicate that his leg had been injured in the accident.
Sergeant Johnson was around Mr. Aycock for an hour. He also concluded that Mr. Aycock was not injured. Although there was a noticeable odor of alcohol on his breath, Mr. Aycock was able to coherently answer questions. He even admitted to Sergeant Johnson that he had a drinking problem and that he needed to straighten out his life. Jailer Hines also observed the decedent. Like the other officers, he found Mr. Aycock to be coherent.
The testimony of the police officers demonstrates that Mr. Aycock appeared intoxicated. Even though he had been involved in the car accident, he had no visible bruises or cuts. He was coherent, and readily able to communicate with the officers. He requested permission to use the telephone a second time to ensure that he would be bailed out quickly. The officers agreed and escorted him downstairs from the jail to allow him to use the phone.
As in Abraham, we consider another important factor. After his release, Mr. Aycock returned home with his wife. Mrs. Aycock obviously never sought any medical help for her husband until after his fall that evening. We can only interpret this to mean that she did not find her husband to be acting in an unusual manner or appearing to be in any way distressed.
Under the facts of this unfortunate case, we are unable to find that the police officers acted unreasonably. Mr. Aycock never exhibited more than the classic signs of intoxication. He had no signs of injury. He was able to communicate with the officers, and repeatedly assured them that he had no need for medical assistance. This assignment of error is without merit.

CONCLUSION
The judgment of the trial court is affirmed. Costs are assessed against the plaintiffs.
AFFIRMED.
NOTES
[1] The Court: May I please ask this question for clarification only? Have you testified yet with regard to whether you smelled any odor of anything on Mr. Aycock's breath? I do not recall whether you have or have not.

The witness: Not today, sir, I don't think.
The Court: Good enough. I am just trying to make sure. I do not see it in my notes, and I don't believe you have been questioned about that. Thank you.
[2] The plaintiffs were allowed to make a proffer of the testimony of Douglas R. Gould. He testified that one of the plaintiffs asked him to fix the car. He claimed to have picked up the car at the Merrick Street residence the day after the wreck, and that the windshield was broken. He said he felt broken glass or cracks on the inside of the glass.

We note that this testimony was allowed only as a proffer. The plaintiffs attempted to present Mr. Gould as their rebuttal witness even though the defense rested without presenting any witnesses. The trial court was willing to exercise its discretion to allow the plaintiffs to reopen their case. However, upon learning that the plaintiffs had failed to notify the defendant of the witness' existence, the trial court indicated that it would not allow the testimony.
We further note that Mr. Gould's testimony contradicts that of the expert witness Ray Herd and of Mr. Atwood. It also appears to contradict that of Lynda Aycock. She testified that she saw the car in its post-accident condition on Monday while Mr. Gould said he picked it up to repair it the previous Friday.