CRAIN, Judge.
This is a workers’ compensation case. The plaintiff, Eloise Lloyd, allegedly sustained injuries on August 1, 1980, while in the course and scope of her employment with the defendant, City Products Corp., d/b/a TG & Y. The trial court rendered judgment finding the plaintiff totally and permanently disabled. The court ordered the appropriate compensation and assessed attorney’s fees against defendant in the amount of $2,500. From this judgment defendant appeals.
FACTS
On August 1, 1980, Eloise Lloyd was employed by City Products Corporation at its TG & Y retail outlet in Hammond. Lloyd was 49 years old and employed in sales. Her duties included stocking merchandise. An incident occurred as she was dragging a box of merchandise across the floor to place the products on display. An edge of the box caught on a display case, jerked the box from her grip and caused her to fall. She landed upright on her buttocks with her right leg bent back under her. She immediately reported the incident, and was sent to her local physician, Dr. Forrest. He reported that at that time she stated she injured her right shoulder, hip and ankle. His examination revealed some tenderness over the right posterior rib cage. He prescribed pain medication and released her.
TG & Y’s manager, Jerry Graves, testified that Lloyd reported back to work two days later. She worked through January 1981 when she quit her job. Graves maintains she made no complaints of pain to him during that time. However, Lloyd *955 claims she experienced constant back pain upon her return to work and finally quit in January, 1981 because of the pain.
Dr. Forrest reported he next saw Lloyd on February 26, 1981. She complained of pain in her right ankle and reported she had reinsured her ankle by twisting it. Dr. Forrest stated his examination was completely negative. He noted full range of motion in the ankle and joints without severe pain. He prescribed anti-inflammatory agents.
In March, 1981, Lloyd filed a claim for compensation and began seeing several orthopedic surgeons. She was initially referred by the defendant to Dr. Whitecloud on March 11, 1981. He reported she complained of “very mild, intermittent low back pain, right knee pain, and pain and swelling of the right ankle with instability” and that her primary problem was with her ankle. He indicated her lower back was essentially asymptomatic. He concluded that she sustained a severe right ankle sprain, but that she did not sustain any significant injury to her ankle or her back. In May, 1981, he reported that she still complained of pain in her ankle and foot, but that her complaints of low back pain were resolving. He concluded she was improving and should be able to return to work within a few months.
On August 17, 1981, Mrs. Lloyd saw a different orthopedist, Dr. L.G. Ferachi. He related that her chief complaints were right ankle pain and low back pain from a year old injury that prevented her from working. She stated that the back pain was mostly in the low back region but occasionally radiated down into the right hip. The physical examination was essentially negative.
On October 1, 1981, Lloyd was evaluated by Dr. Howell, a neurologist. She complained of headaches and back pain. His examination was also essentially negative. He reported that “The patient sounds like she may have sustained a mild lumbosacral strain”. A CT scan that was conducted showed no abnormalities.
On November 1, 1981, Dr. Whitecloud reported that a separate CT scan he conducted showed no evidence of any lumbar disc problems. He felt she was able to return full time to work as of September 29, 1981, the date of her last visit.
On November 2, 1981, Dr. Ferachi concluded that Lloyd should be able to work seven or eight hours a day standing and lift up to 25 pounds. On November 25, 1981, Dr. Howell reported that headaches Lloyd was experiencing could not be related to her injury at work.
On the basis of these medical reports, defendant terminated compensation. As a result of this termination of benefits, plaintiff filed this suit in September, 1982.
The trial court heard the matter in March, 1984. At trial, plaintiff’s evidence consisted of her own testimony and that of two chiropractors she had been seeing. Neither party called any of the medical doctors plaintiff had seen. Rather, by joint stipulation they entered into evidence the medical reports of the doctors who had seen Lloyd. They also stipulated that the reports through December, 1981, were the basis for the termination of benefits.
Lloyd testified that prior to the accident she had no history of back pain. She claimed that when she returned to work in August, 1980, she was experiencing back pain that was exacerbated by the lifting and moving of objects. She stated that the pain became so substantial that in early 1981 she was forced to quit her employment. She saw several doctors with her complaints, but claimed that none of them were able to successfully treat her ailments. She further stated that she is in substantial and continuous pain to date.
The plaintiff then presented the testimony of two chiropractors, Drs. Burch and Zuppardo. Lloyd first saw Dr. Zuppardo in February of 1983. He referred her to Dr. Burch for evaluation in August, 1983. Dr. Burch conducted a • thermographic[1] exami *956 nation of Lloyd. He reviewed the thermo-grams, which were displayed in court, and concluded there was objective evidence to support her claims to back pain.
Dr. Zuppardo testified that he had been treating Lloyd for some time and had conducted extensive chiropractic examinations on her. He further testified that based on his treatment of Lloyd and the history she gave, that her present pain related back to her work accident. He diagnosed her as having permanent and chronic, lumbrosa-cral and cervical sprains.
The defense only called two witnesses. The first was Christine Thompson, manager at a retail outlet Lloyd was briefly employed by after leaving TG & Y. She testified Lloyd’s employment was terminated due to problems not related to any back injury. The other defense witness was Jerry Graves, her manager at TG & Y. He testified in regards to her work history there. The trial court took the matter under advisement and later rendered judgment as outlined previously. The court did not render reasons for judgment. Defendant appealed suspensively and asserts the following assignments of error:
1) The trial court erred in finding the plaintiff met her burden of proving she was totally and permanently disabled and/or that any disability resulted from a work incident;
2) The trial erred in awarding plaintiff attorney’s fees;
3) The trial court erred in allowing plaintiff to enter evidence establishing odd-lot disability;
4) The trial court erred in accepting Dr. Burch as an expert in thermography.
Finding merit to defendant’s first assignment of error, we reverse.
DISABILITY
It is undisputed that the plaintiff was involved in a work related accident. It is also axiomatic that a plaintiff-employee in a workers’ compensation case must establish by a reasonable preponderance of the evidence an accident resulting in disability. Peck v. TG & Y Stores Co., 451 So.2d 1327 (La.App. 1st Cir.1984). Lloyd’s alleged disability is based largely on her uncorroborated testimony. Normally, such evidence should be accepted as true when uncontradicted, if the record indicates no sound reason for rejection. Robertson v. Scanio Produce & Institutional Foods, Inc., 449 So.2d 459 (La.1984). One sound reason for rejection is where circumstances cast doubt on the reliability of the testimony. See West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979). We find that plaintiff's testimony contains numerous inconsistencies and contradictions with the other evidence which cast sufficient doubt on its reliability that what little corroborative evidence there is does not support the findings in her favor.[2]
The plaintiff testified that her return visit to Dr. Forrest on February 26, 1981, was due to her ankle swelling. When asked on direct examination whether she had rein-jured that ankle, she replied in the negative. In Dr. Forrest’s deposition he testified that she complained of having rein-jured the ankle on January 15 of that year. On cross-examination she specifically denied making any such statement:
Q. ... you stated that you’d hurt your ankle on January the 15th?
A. No, I didn’t tell him that.
[[Image here]]
Q. So if Dr. Forrest has that in his records, he’s wrong.
*957 A. If he says it he’s wrong, ‘cause I didn’t tell him that.’
We doubt that Dr. Forrest would not only incorrectly report such an incident, but that he would also relate a specific date some six weeks prior to the visit, when it was supposed to have occurred.
When asked about the amount and location of pain she reported experiencing to Dr. Ferachi, the testimony was as follows:
Q. So, if Dr. Ferachi says that you just complained of a slight, low back pain, then Dr. Ferachi’s wrong, too, is that right?
A. That’s right, ’cause I told him where I hurt.
This testimony is typical of the evidence which bears on the degree, location and type of pain that she had been experiencing. She claimed substantial pain from her neck along her back and down through to her right leg, “all along”. Yet the medical reports fail to substantiate these extensive claims, and for the most part, contradict them. Despite her claims of extensive pain from the date of injury, she did not report them to Dr. Forrest either initially or at her later visit to him some seven months later; nor did she report any back pain to TG & Y or exhibit any signs of working in pain during this period. Evidently the first notice defendant had of any problems was in March when plaintiff filed a claim. Her chief complaints to the orthopedic surgeon who examined her initially were of her right ankle. She also reported mild pain in her lower back, which the doctor later reported was resolving. As the reports of ankle pain decreased, reports of back pain began to increase. She also began seeing a neurologist for headaches which she had not previously reported. There were essentially no objective signs to substantiate extensive back pain problems. By November of 1981 her treating physicians felt she could return to work.
Further inconsistencies are apparent from the following testimony under cross examination:
Q. Now, back when we took your deposition, I asked you what type of pain you were feeling and you said it hurt between your hips and your ribs, the bottom of your ribs? You’re saying now
A. Yeah.
Q. —It hurts all the way down?
A. It hurts all the way now.
Q. and that’s happened since April of ’83?
A. It’s been hurtin’ all along.
Q. Well, Mrs. Lloyd, I took your deposition under oath, back in April of ’83, so I could find out what was wrong with you and what the status of the case was, and at that time, you told me that you had a constant, just soreness, between your hips and your ribs? Are you sayin’ that— that your testimony
A. I know it’s—
Q. —Then, was not right?
A. And I still have it. I still have the soreness. Right there. But now, it hurts all the way across.
Q. So, that’s started since April of ’83?
A. Yeah.
Lloyd testified that she quit defendant’s employ because of back pain. Her manager testified it was his impression she left because of the reduced work hours the store imposed after the Christmas rush. He also testified that she left at the same time the previous year for those reasons, but returned when the hours went back to full time.
Plaintiff also claimed that she had to quit another job after only three days because of pain; however, the manager there testified she never made any complaints of working in pain. It was also shown that instead of quitting, plaintiff’s employment was terminated by the store because she was slow in handling the store’s register.
Significantly her last medical visit was in April of 1982. Despite her claims to crippling pain, she sought no further medical attention for close to a year. Finally, in February, 1983, she began seeing Dr. Zup-pardo for chiropractic treatment. He testi *958 fied that she did exhibit some objective signs of pain. However, many of the tests he based these findings on, had two years earlier been reported negative by her treating physicians. Dr. Zuppardo’s conclusion was also based on evaluations of the ther-mograms that were taken. They showed asymetrical heat patterns, which were some evidence of pain, but could not indicate the degree of pain experienced. Additionally, the thermograms were in no way conclusive. As Dr. Burch, the chiropractor that administered them testified:
Q. Doctor Burch, once again, you said in — in looking at those, even though a pattern may show up on the right, it may indicate there’s a problem on the left, or vice versa, right?
A. It doesn’t indicate anything; you just — you don’t know. All we know is that one side does not match the other. We can’t say that she is an acute phase on the right. Or in a chronic phase on the left. All we know is that something is going on at L — 4, L — 5.
Plaintiff fell and missed three days of work. Seven months later, she quit. She had previously quit about the same time due to reduced work hours. One month later, she made a compensation claim claiming injuries which she never before reported. She was examined by several doctors who find little objective evidence of injury. The pain that is reported, varies from doctor to doctor in differing areas and degrees, but is never described as substantial. After several months of care she was advised to return to work. No further medical advice was sought for a year. Then chiropractic care was started years after the accident. The plaintiff’s testimony throughout is contradictory and inconsistent.
When reviewing the record as a whole, the weight of the evidence simply does not support a factual conclusion that it is more probable than not that plaintiff is disabled from her fall at work.
There is no medical evidence whatsoever which attributes to Lloyd any degree of physical disability. Three of her attending physicians felt she was able to return to work. Dr. Zuppardo gave no testimony in regard to Lloyds’ degree of disability. Nor did h¿ give any opinion as to whether the plaintiff is able to return to her job or engage in any other type of gainful occupation. Even when plaintiff was first examined by Dr. Zuppardo, all he could find was a slight discomfort in her lower back. Dr. Zuppardo also related that later on during his course of treating plaintiff that “We would work on her, she would leave the office and be free of pain for a couple of days, and then it would slowly come [back].” Without having the trial court’s written reasons for judgment, we are not enlightened as to his reasons for declaring plaintiff to be totally and permanently disabled. However, the record indicates that the substantial pain doctrine is the only possible basis for such a holding. Although the plaintiff did not allege disability due to substantial pain in her petition, such a contention seemed to be the primary thrust of the case.
A plaintiff who alleges substantial pain as the cause of disability must establish the existence of that condition to a reasonable certainty and by a fair preponderance of testimony. The issue must, be decided by the trier of fact on the basis of the totality of the medical and lay evidence presented. Dauzat v. Gregory & Cook, Inc., 454 So.2d 807 (La.1984), Lanus v. Gulf Wandes Corp., 470 So.2d 492 at 495, (La.App. 1st Cir.1985).
We are convinced that the totality of and weight of the evidence presented does not support a finding that plaintiff has proved by a reasonable and fair preponderance of the evidence that she is totally and permanently disabled due to experiencing substantial pain. A contrary finding is clearly wrong. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978).
Accordingly, as we find that the plaintiff has failed to establish disability by a preponderance of the evidence, either through physical impairment or substantial pain, we *959 reverse that judgment in her favor; appel-lee to pay costs.
REVERSED AND RENDERED.

. Thermography is a relatively new diagnostic tool. It basically consists of a large flat translu *956 cent plate which contains a heat sensitive gell. The plate is pressed against the patient. The gell turns various colors which correspond to the amount of blood flow and subsequent heat generated by the particular portion of the patient’s body it is placed on. Various patterns emerge of which pictures are taken. Theoretically the patterns should be symmetrical, unless an abnormality exists. For example, the patterns on an individual's right and left leg should be symmetrical. An asymmetrical pattern can indicate some type of damage or neurological pathology in one of the limbs accounting for pain.

. This consisted of questionable rebuttal testimony by her husband that she did complain of back pain immediately after her fall.