593 So.2d 273 (1992)
Faye A. FERGUSON, etc., Appellant,
v.
Neil PERRY, Sheriff of St. Johns County, Appellee.
No. 91-551.
District Court of Appeal of Florida, Fifth District.
January 17, 1992.
*274 Henry E. Davis of Roberts & Davis, P.A., Jacksonville, for appellant.
Julius F. Parker, Jr. of Parker, Skelding, Labasky & Corry, Tallahassee, for appellee.
GRIFFIN, Judge.
Faye A. Ferguson, as personal representative of the estate of Herbert Lee Bryant, Sr. ("appellant"), appeals a summary final judgment entered in favor of Neil Perry, Sheriff of St. John's County ("appellee") in a wrongful death action. We reverse.
This suit was filed below against the City of St. Augustine, St. John's County and Neil Perry, Sheriff of St. John's County.[1] Plaintiff's decedent, Herbert Lee Bryant ("Bryant") was a 33-year-old black male who died of a cerebral hemorrhage allegedly due to the failure to provide him with proper medical care while he was in police custody.
Viewed in a light most favorable to appellant, the record contains the following facts. Bryant was stopped by St. Augustine Police Officers Shapiro and McIntyre shortly after midnight on April 19, 1986 for driving his vehicle without his headlights on and for driving in an erratic manner. According to the officers, his clothes were dirty, he was "swaying" on his feet, and the officers smelled a "faint" odor of alcohol on him. No alcohol or drugs were found in his vehicle. Bryant agreed to take a series of field sobriety tests, during which he appeared "very wobbly".
Officer Shapiro concluded that Bryant was under the influence of alcoholic beverages and placed him under arrest for driving while intoxicated. Bryant was transported to the St. Augustine Police Station, where he was given a breathalyzer test which registered a blood/alcohol level of .04.[2] Because of the low alcohol level shown by the breathalyzer, which indicated Bryant was not intoxicated,[3] Officer Shapiro concluded that Bryant was under the influence of illegal drugs. Bryant was *275 asked to give a urine sample, which he agreed to do.
Officer Shapiro's Incident Report indicates that while Bryant was at the St. Augustine Police Department, his condition worsened:
At SAPD, suspect['s] lack of control of faculties became more pronounced; walking into walls, extreme staggering; incoherent speech; passed out. Suspect began sweating profusely; could not sit still; complaint that handcuffs were tight although I could place my thumb between his wrist and the handcuff on each arm.
An Alcohol Influence Report Form filled out by Officer Shapiro contained the following comments concerning Bryant's condition: "staggering  inability to understand questions  while interviewing him he passed out." The second half of the form  which contains questions such as, "Are you ill" and "If so, what's wrong"  was left blank, with the notation "unable to answer" written across it in large letters.
Bryant was transported at approximately 2:20 a.m. to the St. John's County Jail, which serves as an intake and housing facility for arrests made within the City of St. Augustine. Officer Shapiro left a General Offense/Incident Report, the Arrest Report and the Alcohol Influence Report at the County Jail. An investigative report completed after Bryant's death by Lieutenant Donna Robertson of the St. John's County Sheriff's Department indicated that Bryant was staggering, his pants were below his hips and his clothing was in disarray. Bryant was able to cooperate with a search, but he began to pass out and had to be helped to a holding cell. According to the report, at this point one of the intake officers questioned in his own mind whether Bryant should be admitted to the jail; he would have taken Bryant's blood pressure had there been a blood pressure cuff available.
As part of the admissions process, the booking officer was required to fill out a Medical Screening Form on each prisoner. The form has two sections  the first based on the officer's visual observations and the second based on answers to be given by the prisoner. The first section of Bryant's form indicated he was "barely" conscious, but that he had no symptoms or visible signs suggesting the need for emergency medical care. The form also noted he had no fever and was not carrying any type of medication. The second half of Bryant's screening form was left blank, with the notation "highly intoxicated  unable to answer any questions." It reflects Bryant was placed on a fifteen minute watch out of fear he might vomit, aspirate and choke to death.
The officers on duty checked on Bryant a number of times during the night. On several occasions he was observed to be sleeping. Once Bryant was found standing by the wall and, when told to lie down, he staggered back to his mattress. On another occasion, when an officer heard change rolling around in Bryant's pocket and went into his cell to remove it, she found him standing again and had to help him to the mattress. At 6:20 a.m., Bryant asked for some aspirin. One of the officers advised the incoming shift that Bryant was "completely out of it." The officers uniformly described Bryant as being "highly intoxicated."
At approximately 9:00 a.m., Bryant was taken to first appearance before Judge Andreu at the front desk of the jail. At that time, Bryant was described as "incoherent," his eyes "were rolled back in his head" and he "had to be bodily carried out of the cell" by two of the officers. The judge advised that Bryant was too incoherent for first appearance.
Bryant was physically carried back to the holding cell by the two officers and the nurse was called to come in. The nurse saw Bryant between 9:30 and 10 a.m. He was lying on his back on the floor. The nurse got no response from Bryant and could feel no pulse; he merely "grunted" when his name was called and his pants were wet. She advised that Bryant should be transported immediately to the hospital. One officer described Bryant as being in a "zombie-type stage, like he was over relaxed." He required help to get to the *276 police vehicle and he lay down on the seat all the way to the hospital. At the hospital, Bryant was given a number of medications to bring his blood pressure down, but they had no significant effect. By that afternoon, Bryant was apparently lapsing in and out of consciousness.
When Bryant's test results showed blood in his spinal fluid, on April 21, 1986, he was transferred to Jacksonville Memorial Hospital ("Memorial"). His medical workup showed Bryant's condition was as follows:
He was mute, unable to talk. He would open his eyes occasionally, but was combative and weak on his left side. He did not follow commands. His eyes deviated to the right. His pupils were small and poorly reactive. His blood pressure on admission was 240 over 120.
The diagnosis was an intraventricular hemorrhage, which results in bleeding into the fluid cavities in the middle of the brain. Doctors attempted to bring his blood pressure down, but Bryant's condition rapidly deteriorated after his admission to Memorial. Dr. Lohse, who treated him, believes he suffered a second subarachnoid hemorrhage on the evening of April 21. That night he suffered a sudden respiratory arrest and progressed into a deeper level of coma. Although he was resuscitated and placed on a respirator, he died two days later. Dr. Lohse is unable to tell exactly when Bryant suffered his first hemorrhage, but is sure it occurred within a couple of days of his admission to Memorial.
Appellant contends the summary judgment should be reversed since there is a genuine issue of material fact as to whether the Sheriff of St. John's County, through his employees, knew or should have known that Bryant required medical care during the hours after his arrest, and whether the failure to provide medical care was a legal cause of Bryant's death.
The sheriff asserts he was entitled to summary judgment because appellant failed to show any facts which would indicate to the officers at the jail that there was anything physically wrong with Bryant other than being intoxicated. The trial judge granted the sheriff's motion for summary judgment, finding that Bryant's death was not "foreseeable" by jail personnel. He relied primarily on Guice v. Enfinger, 389 So.2d 270 (Fla. 1st DCA 1980), which he found factually similar to the case at bar. He acknowledged our prior decision in Hutchinson v. Miller, 548 So.2d 883 (Fla. 5th DCA 1989), but found it distinguishable.
Whether summary judgment was proper in this case turns on a determination of the duty owed by the sheriff to appellant's decedent. The Florida cases cited by the parties are distinguishable because they involve suicide by jail inmates, which necessarily implicates issues of foreseeability and intervening cause not involved in this case. The parties have cited no cases involving the precise question presented here, which is the extent of the duty of a police officer to recognize an inmate is ill and to secure medical treatment.
Our research has revealed that nationwide there are not very many cases that discuss this duty, although several cases having fact patterns similar to the case at bar have arisen in Louisiana. Aycock v. City of Shreveport, 535 So.2d 1006 (La. App. 1988), writ denied, 536 So.2d 1223 (La. 1989); Abraham v. Maes, 430 So.2d 1099 (La. App. 1983); Cobb v. Jeansonne, 50 So.2d 100 (La. App. 1951). In each of the cited Louisiana cases, the court concluded that the condition of the inmate was such that the officers were reasonable in their belief that the prisoner was intoxicated by alcohol or drugs, and not ill.[4]
*277 It is clear that corrections officers have a duty to use reasonable care to insure the safety of inmates during their incarceration. See Hutchinson, 548 So.2d at 885. This duty is described in section 314A of the Restatement (Second) of Torts which identifies the special relationships that give rise to a special duty:
(a) to protect them against unreasonable risk of physical harm, and
(b) to give them first aid after [the party burdened by the special duty] knows or has reason to know that they are ill or injured, and to care for them until they can be cared for by others.
This duty extends to "[o]ne who is required by law to take or who voluntarily takes the custody of another under circumstances such as to deprive the other of his normal opportunities for protection... ."[5] The following is one of the examples of liability illustrated in the Restatement:
2. A, a passenger riding on the train of B Railroad, suffers an apoplectic stroke, and becomes unconscious. The train crew unreasonably assume that A is drunk, and do nothing to obtain medical assistance for him, or to turn him over at a station to those who will do so. A continues to ride on the train in an unconscious condition for five hours, during which time his illness is aggravated in a manner which proper medical attention would have avoided. B Railroad is subject to liability to A for the aggravation of his illness.
Restatement (Second) of Torts § 314A, illustration 2 (1965). Applying this duty to render medical treatment, recognized by both the Restatement (Second) of Torts and relevant case law to the facts of the present case, we conclude that the question whether the sheriff's personnel knew or should have known much sooner than they did that Bryant needed medical attention is a jury question.
We agree with the sheriff that nothing in this record shows that officers knew Bryant was suffering any malady other than intoxication due to drugs. We disagree, however, that the sheriff's belief that Bryant was under the influence of drugs precludes liability. That belief may have been unreasonable. Moreover, in addition to intoxication, the ingestion of drugs can cause death or illness giving rise to a need for medical care. No matter what the cause, when a person detained by the police manifests such symptoms as would place a reasonable person on notice that the inmate is in need of medical attention, the police are bound to take steps that are reasonable under all relevant circumstances to obtain such care. This duty is even greater to a person whose condition is such that he is unable to adequately care for himself.
Finally, the sheriff claims immunity from suit under the doctrine of sovereign immunity. Appellee urges this case involves the discretionary function of "prisoner classification", i.e., "where and how to house them and where and how to deploy correctional personnel." In support of its sovereign immunity argument, appellee cites Florida cases involving the failure by jail or prison personnel to recognize the dangerous propensities of particular inmates *278 and to take adequate measures to protect other inmates from the dangerous inmates. Those cases are distinguishable from the present case. The alleged negligent failure to comply with the duty to provide medical care to Bryant is an operational level activity for which the sheriff is not immune from suit. Hutchinson, 548 So.2d at 886.
REVERSED and REMANDED.
DAUKSCH and W. SHARP, JJ., concur.
NOTES
[1] The remaining defendants have settled and are not involved in this appeal.
[2] St. John's County Jail policies and procedures do not permit the facility to accept prisoners who are "unconscious" or "seriously injured." In particular, their guidelines prevent acceptance of inmates with visible injuries or those with a blood/alcohol level of .30 or more.
[3] See § 316.1934, Fla. Stat. (1989).
[4] The Louisiana courts have stated the standard of care to be the following:

A police officer must exercise reasonable care to preserve the safety of the person in his custody. Additionally, a police officer owes a higher degree of care to an intoxicated person than to one who is more capable of caring for himself. It is the duty of an arresting officer to see that reasonable medical service is provided to his prisoner if and when his mental/physical condition discloses the need of such services.
Aycock, 535 So.2d at 1015-1016.
[5] The comments to the section explain:

d... . The duty to give aid to one who is ill or injured extends to cases where the illness or injury is due to natural causes, to pure accident, to the acts of third persons, or to the negligence of the plaintiff himself... .
e. The duty in each case is only one to exercise reasonable care under the circumstances. The defendant is not liable where he neither knows nor should know of the unreasonable risk, or of the illness or injury... . He is not required to take any action where the risk does not appear to be an unreasonable one, as where a passenger appears to be merely carsick, and likely to recover shortly without aid.
f. The defendant is not required to take any action until he knows or has reason to know that the plaintiff is endangered, or is ill or injured. He is not required to take any action beyond that which is reasonable under the circumstances. In the case of an ill or injured person, he will seldom be required to do more than give such first aid as he reasonably can, and take reasonable steps to turn the sick man over to a physician, or to those who will look after him and see that medical assistance is obtained....
Restatement, supra, comments d, e and f.